Morris v. Scenera Research, LLC, 2012 NCBC 1.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
09 CVS 19678

ROBERT PAUL MORRIS,                   )
                                      )
            Plaintiff,                )
                                      )        **MEMORANDUM OPINION**
      v.                              )
                                      )
SCENERA RESEARCH, LLC, and            )
RYAN C. FRY,                          )
                                      )
            Defendants.               )
                                      )

{1}  The matter is before the Court on cross-motions for summary judgment.  This Memorandum incorporates preliminary rulings of which the Parties were advised by e-mail.  This Memorandum is also somewhat abbreviated as the Court seeks to issue a prompt ruling in light of the approaching trial date.

> *Young Moore and Henderson P.A. by Walter E. Brock, Jr. and Andrew P. Flynt and Coats & Bennett PLLC, by Anthony J. Biller, for Plaintiff Robert Paul Morris.*
>
> *Kilpatrick Townsend & Stockton LLP, by Hayden J. Silver III and John M. Moye, for Defendants Scenera Research, LLC and Ryan C. Fry.*

Gale, Judge.

Nature of the Action and Procedural History

{2}  This case involves multiple claims and counterclaims arising from Plaintiff Robert Paul Morris's ("Morris") prior employment with Defendant Scenera Research, LLC ("Scenera") of which Defendant Ryan C. Fry ("R.

Fry") was an officer.  R. Fry's father Stan Fry ("S. Fry") was involved in hiring Morris and is often referred to in the record.

{3} The early procedural history of the case is summarized in this Court's Order on Motions to Compel entered August 26, 2011.   The Court issued a final order on the Motions to Compel on October 10, 2011, which then triggered deadlines for filing dispositive motions.

{4} On October 24, 2011, Morris filed his Motion for Partial Summary Judgment ("Morris's Motion") which seeks to dismiss Scenera's Eighth and Eleventh Defenses and the Third and Fourth claims of Scenera's Second Amended Answer and Counterclaim, which related to Morris's asserted breaches of fiduciary duty and refusal to continue to assign invention rights.[1]

{5} Also on October 24, 2011, Scenera and R. Fry filed Defendants' Motion For Summary Judgment ("Defendants' Motion") which seeks judgment in Defendants' favor on Count I of the Counterclaim which seeks to have the Court declare that Scenera owns patent rights to Morris's inventions made during the term of his employment and also seeks to dismiss Counts II, III, and IV of Morris's Complaint which seek relief based on claims of fraud, unjust enrichment, and retaliatory discharge.

{6} The motions were completely briefed, after which the Court held oral argument on December 20, 2011 and gave the Parties informal notice of its rulings by a December 27, 2011 e-mail.

Facts

{7} Many of the background facts are undisputed, such as Morris became a prolific inventor and that at least until late 2008 he assigned the majority of those inventions to Scenera.  The primary dispute revolves around whether Morris was obligated to assign those rights or whether his assignment was voluntary, and whether such assignments may now be

---

[1] The Court uses the term "invention rights" as including patent assignments.

rescinded because Scenera has refused to pay Morris compensation to which he is entitled.  While the issues will have to be more carefully crafted before submission to the jury, primary contested factual issues underlying this key issue and addressed in the cross-motions include: (1) whether Morris was "hired to invent;" (2) if so, whether Morris and Scenera agreed that ownership of any invention was vested in Morris until he elected to offer and Scenera accepted assignment of the inventions in exchange for payments pursuant to a bonus compensation system over and above his base salary; (3) whether that bonus system was cancelled as of the end of 2007 or was instead merely suspended while Scenera considered an alternative compensation system that Morris expected based on discussion with R. Fry; (4) whether Scenera and/or R. Fry promised to offer Morris more favorable compensation in order to induce Morris to continue assigning inventions during 2008, while having no intention to fulfill those promises; (5) whether Morris is entitled at a minimum to recover payments under the bonus system; (6) whether Morris was terminated because he threatened an action to collect those amounts Scenera refused to pay, entitling him to additional statutory penalties; and (7) whether Morris is entitled to rescind assignments already made.  As discussed below, the Court determines that some of these issues may be resolved by summary judgment whereas others cannot.

{8}  Morris's Complaint includes claims for breach of contract, fraud, unjust enrichment, and retaliatory discharge, and seeks monetary remedies or, at his option, the alternative rescission of invention assignments. Scenera in turn seeks a declaration that Morris was hired to invent as a result of which he was, as a matter of law, obligated to assign any invention to Scenera, narrowing the trial to whether Morris is entitled to bonus compensation.  Scenera contends that Morris is not entitled to rescind any assignment he has already made and is obligated to assign inventions made during the term of his employment that he has not yet assigned.  Scenera claims that Morris resigned his employment, but even if Scenera terminated

him, it had the right to do so for non-pretextual reasons unrelated to his wage claim, particularly because Morris refused to abide by his obligation to continue to make patent assignments. Scenera further claims that Morris breached fiduciary duties owed to Scenera.

{9} Morris was a former IBM employee with substantial training in software. He later was employed by Flashpoint Technologies, a company founded by S. Fry. S. Fry had also formed a company which was initially a holding company known as IPAC. IPAC later became known as Scenera. While employed by Flashpoint, Morris and IPAC entered a Confidentiality Agreement which included mutual non-disclosure obligations and pursuant to which any confidential information remained the property of the disclosing party. (Morris Aff. Ex. B ¶¶ 2, 3.) Morris was not at that time an IPAC employee but contracted with IPAC.

{10} S. Fry hired Morris in 2004 as Scenera's first employee. Morris had a series of discussions with S. Fry preceding this employment, the extent, nature, and significance of which are disputed insofar as they represent any agreement regarding whether Morris was expected to invent for Scenera and whether there was an understanding reached that Morris would own any invention made during the course of his employment until he voluntarily offered to assign and Scenera accepted assignment of any such invention. Morris testified that he expressed an interest in inventing but was neither obligated to nor expected to invent as a part of the regular employment duties he would undertake for Scenera, and that his base salary was for the substantial duties other than inventing for which he was responsible.

{11} Morris and Scenera did not sign a written employment agreement. Morris contends that the Parties understood that the ownership provisions of the Confidential Agreement Morris signed while employed by Flashpoint continued. Scenera contends that there was no such agreement and that once Morris was hired to invent for Scenera, he had no ownership rights in inventions made during the course of that employment.

{12} As discussed in the analysis below, a critical initial factual dispute is then whether Morris was "hired to invent."   The resolution of that issue controls the legal principles by which further claims must be decided, including the burden of proof on the issue of ownership.  If Morris is correct that he was not hired or specifically charged to invent as a part of his employment, then he would own inventions absent a contrary agreement, and the burden of proving that agreement would fall on the employer.  On the other hand, if Morris were hired or directed to invent as a part of his employment, the controlling North Carolina legal standard would vest ownership of the inventions in Scenera absent a contrary agreement, and the burden of proving such an agreement rests with the employee.  Morris has a claim to compensation associated with his inventions separate and apart of whether he owned or owns those inventions.  It is undisputed that during certain times of Morris's employment, in addition to his base salary,  Morris was entitled to receive up to $10,000.00 for each of his inventions on which Scenera pursued patents, with $5,000.00 being earned when a patent application was submitted and $5,000.00 being earned when a patent issued.  Scenera concedes that the claim to this compensation survives summary judgment.

{13} Morris proved to be a prolific inventor.  By July 2009 when Morris's employment with Scenera ended, Morris contends that the unpaid amount that had accrued under his bonus compensation plan was $210,000.00.  Scenera contends that the bonus compensation system had terminated as of the end of 2007, after which Morris was entitled to no further bonus compensation.  While Morris concedes that he voluntarily suspended bonus payments beginning at the end of 2007 as Scenera undertook to formulate an alternative compensation program, he contends that the bonus program was not cancelled, and that he continued to make patent assignments during 2008 only because he knew he was entitled to compensation in addition to his base salary.  Morris contends that R. Fry

promised that the offered alternative compensation would be tied to Scenera's profitability and more favorably reflect Morris's contribution to that profitability, and better reflect Morris's risk and his reward.

{14} Morris alternatively claims that even if the bonus program had been terminated at year-end 2007, R. Fry in July 2008 promised that the bonus system would be reimplemented for Morris if Scenera did not meet certain conditions by year end, such as providing Morris with an individual written employment contract and an appropriate incentive compensation program, and that these conditions were then not met.

{15} Scenera contests Morris's recollection of these conversations, and further claims that if R. Fry made promises, he kept them by proposing a employment contract and an employee incentive program. Ultimately, no agreement on any alternative compensation plan was ever reached and no written employment agreement was executed. Morris claims that these proposals did not satisfy promises R. Fry made and that other documents prove that R. Fry never had any intention of keeping his promises. Scenera claims R. Fry had never made promises specific enough to be enforceable but rather had only agreed to make a proposal for further negotiation, which he did, and that essentially Morris seeks to enforce "an agreement to agree."

{16} Morris testified to his frustration with the lack of progress toward the promised incentive plan and written employment agreement and that he began in 2008 to press R. Fry for progress. He continued to press into 2009, ultimately hiring a lawyer who threatened on Morris's behalf to bring a wage claim under North Carolina's Wage and Hour Act, N.C. Gen. Stat. §§ 95-25.1–25.25, for the $210,000.00 bonus compensation that had accrued and which Scenera refused to pay after Morris's demand.

{17} The Parties disagree both on the facts leading up to the end of Morris's employment in July 2009 and whether that end should be treated as a resignation or a termination. Morris claims that he was terminated in retaliation for his threat to bring a wage claim, which is a protected activity,

such that he is entitled to recover under North Carolina's Retaliatory Employment Discharge Act, N.C. Gen. Stat. §§ 95-240–245 ("REDA"). Scenera contends that Morris had made clear his intention to leave the company and his attorney had indicated that the only option was to negotiate a severance agreement, so that, as a result, Morris had effectively resigned and Scenera accepted his resignation. Scenera alternatively contends that even if it had terminated him, the termination was not retaliatory because it had an independent right to terminate him because he refused to make any further invention assignments to Scenera while being legally obligated to do so.

{18} Scenera further claims that Morris, during the course of his employment, breached fiduciary duties owed to Scenera by virtue of his position as a company officer and because he had a level of responsibility and control over the invention process sufficient to create common law fiduciary duties. It contends Morris breached those duties by refusing to make further assignments, refusing to support one application before the USPTO, and by improperly pursuing opportunities with potential licensees for his own personal benefit. Morris denies that he had such fiduciary duties in the first instance and further that he breached any duty that might be found.

{19} More extensive facts elaborating on the positions are detailed in extensive affidavits and deposition testimony.

{20} Morris seeks summary judgment on Scenera's Third Counterclaim (breach of fiduciary duty), Fourth Counterclaim (refusal to assign), Eighth Defense (affirmative REDA defense of independent basis to terminate), and Eleventh Defense (unclean hands based on breaches of duty). Scenera seeks summary judgment on Count I of its Counterclaim (patent ownership) and Morris's third claim (fraudulent inducement) and fourth claim (unjust enrichment).

## Standard of Review

{21} Pursuant to N.C.R. Civ. P. 56(c) ("Rule 56"), a party is entitled to summary judgment if the record shows that "there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. GEN. STAT. § 1A, Rule 56(c) (2011). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, which may be met by proving that an essential element of the opposing party's claim is nonexistent. *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002). If the movant successfully makes such a showing, the burden then shifts to the nonmovant to present specific facts establishing the presence of a genuine factual dispute for trial. *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982).

## Analysis

## The Issue of Ownership of Invention Rights

{22} As noted, a central issue that controls the legal principles the Court must apply to many of the claims and defenses is whether Morris was "hired to invent," and whether this issue can be resolved summarily. The Court concludes that, even when viewing the evidence most favorably to Morris, the developed record, and particularly his own testimony, establishes without material dispute that Morris was hired to invent and invention was a part of his regular employment responsibilities. However, the Court also concludes that the facts are in material dispute whether Morris and Scenera agreed that Morris owned and was not obligated to assign invention rights, and that Morris bears the burden of proving such an agreement, in the absence of which ownership rights are vested in Scenera. Further, even if Morris initially owned invention rights, he assigned them to Scenera. If Morris is able to prove that the bonus compensation program remained in effect such that Scenera has not paid what it was obligated to pay, Morris is

entitled to compensation but he is not entitled to rescind assignments he has already made. Whether he is obligated to assign inventions he has not already assigned depends on whether Morris can prove that agreement. If he cannot, he is obligated to assign those inventions to Scenera, and Scenera may or may not be obligated to pay bonus compensation in exchange depending on whether the bonus system remained in effect.

{23} Morris's Complaint asserts, and he has continued to testify, that he was not hired to invent, but rather was hired for other substantial functions, including overseeing the invention disclosure process. (Complaint ¶¶ 10–14.) The evidence, construed in Morris's favor, tends to establish that he did not believe he was obligated to assign invention rights. However, his unilateral understanding is not controlling once it is established that he was hired or tasked to invent.

{24} Morris concedes that one of his primary job responsibilities was to determine which inventions, including his own, went forward. (Morris Dep. 106:19–20.) However, he further claims that his responsibilities did not obligate him to assign inventions and that inventing was beyond his normal job duties. The Court concludes that his own testimony establishes otherwise.

{25} Shortly after his employment with Scenera began, Morris prepared a report which listed his personal goal of developing new invention disclosures as a part of his work in research and development. (Morris Dep. Ex. 3; Morris Dep. 91:6–23.) Morris has referred to himself as Scenera's "lead inventor," "chief inventor," and at times its "sole inventor." (Morris Dep. 119:3–120:11; 272:21–273:3; Morris Brief in Support of Motion to Summary Judgment 5.) He has also referred to himself by the title of "Vice President of Research," being compensated at a base salary plus compensation for patents. (Scenera Reply Brief in Support of Motion for Summary Judgment, Ex. U ("Wage and Hour Complaint").) In that same Wage and Hour Complaint, he indicated that he relied on R. Fry's promises regarding a new

compensation system to continue "normal employment activities, including assigning my invention rights . . ." His job description prepared in June 2009, shortly before his employment ended, listed his job description as including "Chief Inventor" among his other job responsibilities. (Morris Dep. Ex. 23.)

{26} Scenera advances deposition testimony by other witnesses to support its contention, which evidence the Court need not here summarize because it concludes that Morris's own testimony is adequate to establish that he was hired to invent.

{27} While the fact that Morris was hired to invent sets the legal standard the Court must follow, it does not fully resolve the issue of ownership of invention rights because there is the further dispute whether Morris and Scenera reached an agreement that varies the normal vesting of ownership in the employer, such that Morris would retain ownership with the option to offer his inventions to Scenera in exchange for bonus compensation.

{28} The ownership issue is essentially a term of the employment contract. While the terms of a contract normally require factual determinations, in the area of inventions by one hired to invent, the law implies invention ownership in the employer in the absence of an actual agreement to the contrary. Controlling North Carolina precedent establishes that the employee who has been hired to invent has the burden of proving such an agreement to the contrary.

{29} Federal patent law regulates who is the inventor, but once the fact and author of inventorship is established, ownership of patent rights deriving from the invention as a matter of the employment contract is governed by state law. *See United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 186−87, 53 S.Ct. 554, 557, 77 L.Ed. 1114, 1118, *amended by,* 289 U.S. 706, 77 L.Ed. 1462 (1933); *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 407 (1996); *Speck v. N.C. Dairy Foundation, Inc.*, 311 N.C. 679,

686, 319 S.E.2d 139, 143 (1984); *Liggett Group Inc. v. Sunas*, 113 N.C. App. 19, 25, 437 S.E.2d 674, 678 (1993).

{30} In *Speck v. N.C. Dairy Foundation, Inc.*, the North Carolina Supreme Court phrased the issue as follows:

> [T]he threshold issue . . . is whether the plaintiffs acquired any interests cognizable in equity or at law at the time they developed the secret process in question. We hold that they did not.
>
> The respective rights of employer and employee in an invention or discovery by the latter arise from the contract of employment. The fruit of the labor of one who is hired to invent, accomplish a prescribed result, or aid in the development of products belongs to the employer absent a written contract to assign.

311 N.C. at 686, 319 S.E.2d at 143 (citations omitted). Under the facts of this decision, ownership never vested with the inventor employee. In *Speck*, the professors had not been specifically assigned the duty to invent, but the invention in question grew directly out of the course of their research functions which were a part of but not the entirety of their responsibilities as professors. As in this case, there was no written employment contract that assigned invention ownership rights.

{31} The North Carolina Court of Appeals was called upon to apply *Speck* in *Liggett Group Inc. v. Sunas*, and in doing so, stated that "[t]he fact of employment, standing alone, does not endow an employer with exclusive ownership rights to an invention, even though the invention may occur during working hours." 113 N.C. App. at 25, 437 S.E.2d at 678. It read *Speck* as establishing two separate pathways by which the ownership is vested in the employer absent contrary agreement: (1) where the employee is "hired to invent, accomplish a prescribed result, or aid in the development of products;" or (2) the employee is set to experimenting with the view of making an invention and accepts payment for such work. *Id.* (citing *Speck*, 311 N.C. at 686–87, 319 S.E.2d at 143–44).

{32}  North Carolina law is perhaps more favorable to the employer than other states.  For example, the Federal Circuit, in addressing an invention ownership dispute governed by Florida law, noted that Florida common law provides that an employer cannot claim ownership of an employee's invention "unless the contract of employment by express terms or unequivocal inference shows that the employee was hired for the express purpose of producing the thing patented."  *Teets*, 83 F.3d at 407 (citations omitted).

{33}  The *Teets* opinion also includes a convenient summary of principles that have developed in the federal courts concerning the interplay between the act of invention and the ownership of invention rights.  It noted:

> Ownership springs from invention.  The patent laws reward individuals for contributing to the progress of science and the useful arts.  As part of that reward, an invention presumptively belongs to its creator.  This simple proposition becomes more complex when one creates while employed by another person.
>
> Consistent with the presumption that the inventor owns his own invention, an individual owns the patent rights even though the invention was conceived and/or reduced to practice during the course of employment.  At the same time, however, the law recognizes that employers may have an interest in the creative products or their employees . . .
>
> In addition contract law allows individuals to freely structure their transactions and employee relationships. An employee may thus freely consent by contract to assign all rights in inventive ideas to the employer.  Without such an express assignment, employers may still claim an employee's inventive work where the employer specifically hires or directs the employee to exercise inventive faculties.  When the purpose for employment thus focuses on invention, the employee has received full compensation for his or her inventive work.  To apply this contract principle, a court must examine the employment relationship at the time of the inventive work to determine if the parties entered an implied-in-fact contract to assign patent rights.

*Teets*, 83 F.3d at 407 (citations omitted).

{34} Both *Teets* and *Speck* determined as a matter of law that in the cases before them ownership was vested in the employer by an implied-in-fact contract. In essence, the logic is that an employer must first prove that the employee was hired or tasked to invent, but an employee, who has been proven to accept employment that includes invention and is paid his employment compensation, by implication agrees that the inventive rights belong to the employer and bears the burden of proving otherwise. The reasoning summarized in *Teets* is consistent with the North Carolina Supreme Court's holding in *Speck* that the question of ownership derives from the employment relationship, and that the agreement to assign ownership to the employer may be implied from the employment relationship if inventing is a part of that relationship.

{35} *Speck's* holding does not preclude the employer and employee reaching an agreement that varies the normal implication of a contract of assignment to the employer. 311 N.C. at 686, 319 S.E.2d at 685. But the employee who was hired or tasked to invent must prove that agreement. *Speck* held that absent such an agreement, the employee never had any ownership interest in the first instance. 311 N.C. at 686, 319 S.E.2d at 143.

{36} In *Liggett Group Inc. v. Sunas*, the employee's initial employment did not include invention and the facts were disputed whether the invention occurred before or after the employer tasked the employee with the responsibility of continuing work to improve the invention. The court noted that if the process invented was after the employer's direction to develop a process, the employee would have been tasked to invent and the process would be owned by the employer. On the other hand, if the process was invented before the employee was tasked with work on the process, the invention would belong to the employee. *Liggett*, 113 N.C. App. at 27, 437 S.E.2d at 679–80. There were then fact issues that precluded summary adjudication. Likewise, fact issues precluded summary disposition of

ownership in *Moore v. Am. Barmag Corp.*, 693 F. Supp. 399, 403 (W.D.N.C. 1988).[2] Here, the Court has determined that Scenera has established that Morris was hired or tasked to invent.

{37} There are cases from other jurisdictions where the facts were that the employer and employee discussed ownership but did not reach mutual agreement, and the court held as a result that no agreement could be implied. As an example, Morris relies on *Banks v. Unisys Corp.*, 228 F.3d 1357 (Fed. Cir. 2000). There, the court held that disputed evidence precluded finding a meeting of the minds for an implied-in-fact contract where at the time of initial employment, the employee refused the employer's request to sign an agreement that would assign any invention to the employer, the issue was never revisited during the term of employment, and the employee refused on the last day of employment to sign an agreement he believed would assign inventions to the employer. As a result, there was no mutual agreement that could be implied. *Banks*, 228 F.3d at 1359–60. The record, however, also included evidence that the employee had made the invention "on his own initiative and on his own time," a fact which may mean the case is more properly read as the standard to be followed when the employee was not hired or tasked to invent. *Id.* at 1358. In fact, it appears that the critical holding in *Banks* was that summary disposition for the employer would not be proper where there was a factual issue of whether the employer had proven one of the two exceptions recognized in *Teets* to "[t]he general rule . . . that an individual owns the patent rights to the subject matter of which he is an inventor, even though he conceived it or reduced it to practice in the course of his employment." *Id.* at 1359.

---

[2] Another federal district court addressed *Speck's* holding only in the context of a preliminary injunction determination and held that where there was no express contractual provision to the contrary the employer has made a sufficient initial showing of a likelihood of success on ownership to justify preliminary injunctive relief. *River's Edge Pharm., LLC v. Gorbec Pharm. Services, Inc.*, No. 1-10CV991, 2011 U.S. Dist. LEXIS 29486 *4 (M.D.N.C. March 22, 2011)

{38} If *Banks* is properly read to rest on the employer's failure to satisfy its burden of proving that the employee had been hired or tasked to invent, its holding is not inconsistent with *Speck* and a requirement that the burden shifts to the employee hired to invent to prove a contrary agreement.

{39} In any event, the North Carolina Supreme Court in *Speck* makes clear that the general rule in North Carolina is that once it is established that the employee is hired or tasked to invent, the invention rights belong to the employer "absent a written contract to assign." 311 N.C. at 686, 319 S.E.2d at 143. While the North Carolina Supreme Court did not expressly so state, it is evident that the burden of proving such an agreement rests on the employee that has been hired to invent, and the employee cannot defeat application of the general rule by proving his own unilateral understanding to the contrary. As a separate note, *Speck* references a "written contract to assign." The Court is not yet prepared to and need not now hold that *Speck* would preclude enforcing a clear oral agreement vesting ownership in the employee. But the Court does read *Speck* to establish a clear presumption that an invention by one hired or tasked to invent belongs to the employer and that presumption controls absent proof of a mutual agreement to the contrary.

{40} *Speck* does not provide guidance on the separate issue of what may be the impact of an employer's failure to compensate its employee. As a general proposition, once it is established that the ownership lies with the employer, the employee is obligated to assign patent rights to the employer. *Dubilier*, 289 U.S. at 187; *see Pedersen v. Akona*, 429 F. Supp. 2d 1130, 1142 (D. Minn. 2006). However, an employer is also obligated to pay his employee.

{41} Neither does *Speck* expressly resolve questions arising when an employee who is hired to invent and proves a mutual agreement vesting ownership with the employee, thereafter voluntarily assigns his invention to the employer in anticipation of additional compensation but the employer refuses payment because of a dispute whether it is owed. The Court holds

that if Morris proves a mutual agreement vesting ownership in him, that same proof also demonstrates that he has consistently assigned the rights to the majority of those inventions to Scenera in exchange for compensation. As a result, his claim is a contract claim for such compensation and any associated statutory penalties. If the jury determines that Morris is owed additional compensation, unless Scenera refuses or is unable to pay that compensation, Morris is not entitled to rescind his prior assignments.

{42} In summary, the Court has determined in Scenera's favor that Morris was hired to invent. The issue then becomes whether Morris and Scenera reached a mutual agreement vesting ownership in Morris. That issue depends on material disputed issues on which Morris has the burden of proof. Even if Morris proves a mutual agreement that ownership was initially vested in Morris, Morris's right became one of compensation once he offered an assignment which Scenera accepted.

{43} The Court concludes that Morris's right for any invention previously assigned to Scenera is limited to that compensation which the jury determines is due pursuant to the patent bonus program, together with any statutory penalties. That amount depends on whether the jury finds that such program continued or was reinstituted. Whether Morris has any obligation to assign any invention he has not yet assigned depends on resolution of the disputed issue of whether the Parties reached a mutual agreement vesting ownership in Morris.

{44} Scenera's motion for summary judgment on Count I of its Counterclaim is GRANTED IN PART and DENIED IN PART. Morris's motion for summary judgment on the Fourth Count of Scenera's Counterclaim is DENIED.

Morris's Fraudulent Inducement and Unjust Enrichment Claims

{45} The Parties have many disputes as to what may or may not have been said between Morris and R. Fry at or around the end of 2007 and

whether such discussions led to an agreement to cancel the patent bonus compensation system that had been in place or merely to suspend it. The Court has held that these disputes cannot be resolved on summary judgment. However, the Court does conclude that those facts, even viewed favorably to Morris, do not support a triable issue of fraudulent inducement or unjust enrichment and that Morris's claim is limited to his contract claim of unpaid compensation together with statutory penalties.

{46} The undisputed evidence demonstrates that Morris continued to make assignments in 2008 knowing that the bonus compensation system had at least been deferred and that there was no binding agreement in place for an alternative compensation system with which Morris would agree. He elected to remain in Scenera's employ and to continue to assign his inventions knowing at best that the only binding agreement was that he would receive payments under the continuing bonus compensation program. If he receives that compensation, he will have received the only compensation on which he could have reasonably relied when making the assignments. The fraud claim duplicates the contract claim and should not proceed independently. *North Carolina State Ports Auth. v. Lloyd A. Fry Roofing, Co.*, 294 N.C. 73, 81, 240 S.E.2d 345, 349 (1978); *see Broussard v. Meineke Discount Muffler Shops, Inc.*, 55 F.3d 331, 346 (4th Cir. 1998); *see also Strum v. Exxon Co., USA*, 15 F.3d 327, 331 (4th Cir. 1994).

{47} Further, the fraudulent inducement claim based on the promise of future compensation fails for lack of reasonable reliance or provable damage flowing from any such reliance. *See Spartan Leasing, Inc. v. Pollard*, 101 N.C. App. 450, 400 S.E.2d 476 (1991) (indicating that dismissal of fraud claim is proper where the facts are insufficient as a matter of law to constitute reasonable reliance by the complaining party). The Court is aware of language in *Liggett v. Sunas*, which if read too broadly without reference to the specific facts of that case, would seem to support a conclusion that a promisee is relieved of some strictures of his burden of proving certainty of

promised future performance if he proves that at the time of the promise the promisor had no intent of performing. 113 N.C. App. at 21, 437 S.E.2d at 681. The specific language from *Liggett* is that: "[f]raud can be predicated upon a promissory representation when the promise is made with the intent to deceive and the promisor has no intent of performing his promise." *Id.* However, it is important to read *Liggett's* holding within the context of its facts. There, the plaintiff employee's evidence was that Liggett had induced him to take an early retirement offer by also promising that he would be rehired as a special consultant. The employee resigned in exchange for that promise, but the employer never rehired the employee. *Liggett*, 113 N.C. App. at 22–23; 437 S.E.2d at 677.

{48} In contrast, in this case, even when construed most favorably to Morris, the evidence is that: (1) Morris and Scenera had a contract pursuant to which Scenera would make bonus payments in exchange for Morris's assignment of patent rights; (2) that bonus system was suspended while Morris awaited a promised offer of an alternative compensation program, the terms of which would have to be determined in the future; (3) Scenera promised that the offer would be Scenera's effort to incent Morris (and others) to invent and better reflect Morris's ability to participate in the financial rewards that would flow from successful monetizing of patents on inventions Morris had made, although Morris expressed no specific requirements for such an arrangement and left details to be established by Scenera; and (4) Scenera's later offer was not acceptable and did not conform in good faith with Scenera's promise to provide Morris a more appropriate employment contract and that he was not "taken care of" as promised. At the times during 2008 when he continued to make patent assignments, Morris knew that the only compensation to which he was guaranteed was the bonus program he had agreed to suspend. The claim to that compensation is grounded in contract and a full award on the contract claim will be adequate

compensation. Morris is then not entitled to rescind assignments he has made on the basis of a claim of fraudulent inducement.

{49} Scenera's motion for summary judgment as to Count III of Morris's Complaint is GRANTED.

{50} For the same reasons, Morris is not entitled to pursue his unjust enrichment claim. His action is in contract for such payments rather than for quasi-contract. *Delta Envtl. Consultants, Inc. v. Wysong & Miles Co.*, 132 N.C. App. 160, 165, 501 S.E.2d 690, 694 (1999) (indicating "[i]t is well established that if there is a contract between the parties, the contract governs the claim and the law will not imply a contract . . . [In such cases] an action for breach of contract, rather than unjust enrichment, is the proper cause of action").

{51} According, Scenera's Motion for Summary Judgment as to Count IV of Morris's Complaint is GRANTED.

Scenera's Claim that Morris Breached Fiduciary Duties

{52} Scenera asserts both an affirmative claim and a defense based on its assertion that Morris breached fiduciary duties owed to the company. The Court finds that there are material issues of fact as to whether Morris owed a fiduciary duty in the first instance, and, even if so, whether Scenera suffered any damage as a result of the breach of such duties.

{53} Scenera claims, and Morris denies, that he was a Scenera officer with corresponding fiduciary duties. Unquestionably, Morris regularly used the title of Vice President of Research, but he claims it was only a title and not an actual office. The disputed issue of fact precludes summary adjudication.

{54} Morris contends that even if he owed fiduciary duties, such duties were waived by Scenera's operating agreement. While Delaware law, which would govern whether a duty arises because of Morris's corporate office, allows for a broad waiver or restriction of such duties as a matter of contract,

Del. Code. Ann. tit. 6 § 18-1101(c), the Court does not believe that the language of the Scenera operating agreement is sufficiently precise to provide for such a complete waiver. *Compare Fisk Ventures, LLC v. Segal*, No. 3017-CC, 2008 WL 1961156, at *11 (Del. Ch. May 7, 2008) (finding language in operating agreement sufficiently definite to "greatly restrict[ ] or even eliminate[ ] fiduciary duties") *with Miller v. Am. Real Estate Partners, L.P.*, No. CIV-A-16788, 2001 WL 1045643, at *9 (Del. Ch. Sept. 6, 2001) (finding language of operating agreement insufficiently definite to disclaim fiduciary duties and that other provisions of operating agreement "imply that the concept of fiduciary duty will apply").

{55} Scenera further claims that Morris owed common law fiduciary duties because of the influence and control he had over the Scenera invention process. *See, e.g., Abbitt v. Gregory*, 201 N.C. 577, 598, 160 S.E.2d 896, 906 (1930); *see also Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 2002 NCBC 4 (N.C. Super. Ct. Jul. 10, 2002), http://www.ncbusinesscourt.net/opinions/2002%20NCBC% 204%20%28Sunbelt%29.pdf (indicating that for fiduciary duties to arise out of an employment relationship, "more must be shown than the ordinary characteristics of the employer-employee relationship"). While the Court believes it a close question, and that the claim may not survive a motion for directed verdict, genuine issues of material fact presently exist as to whether Morris owed Scenera a fiduciary duty because he exercised sufficient domination and influence over the invention process such that Scenera "was somehow subjugated to the improper influences or domination of [its] employee."[3] *Dalton v. Camp*, 353 N.C. 647, 652, 548 S.E.2d 704, 708 (2001).

---

[3] To the extent that the asserted breach is Morris's failure to assign invention rights, that issue will have been resolved through the breach of contract claims. The Court is not yet persuaded that Morris's single failure to attend a meeting with the USPTO rises to the level of a breach of fiduciary duty, particularly considering Morris's offered explanation of why he did not attend. (Morris Dep. at 96–97.)

{56} The Court also believes that if Morris is determined to have fiduciary duties to Scenera, there are material issues of fact whether Scenera suffered any harm from a breach of such duties, and particularly considering that any Scenera monetary claims would largely be resolved with the determination of Morris's contract claims.

{57} Accordingly, to the extent that the cross-motions for summary judgment seek the summary adjudication of the claim or defenses based on the existence or breach of fiduciary duties, they are DENIED.

The REDA Claim

{58} The Parties dispute whether Morris resigned or whether he was terminated, and if terminated, whether he was terminated for non-pretextual reasons independent of his demands for bonus compensation. For purposes of summary judgment, the facts are construed in Morris's favor.

{59} Morris claims that he was terminated in retaliation for his threat to pursue a wage and hour claim once it became clear that Scenera would neither pay him what he contended was his accrued bonus payments nor offer him an acceptable alternative compensation arrangement.

{60} Scenera first claims that no REDA claim lies because there is no temporal connection between Morris's claims and his employment termination. *See Smith v. Computer Task Group*, 568 F. Supp. 2d 603, 613 (M.D.N.C. 2008); *see also Salter v. E & J Healthcare, Inc.*, 155 N.C. App. 685, 575 S.E.2d 46 (2003). While the dispute over Morris's compensation began several months before his employment ended, the Court finds that the issue did not altogether crystalize until shortly enough before his employment ended and that Morris has satisfied the statutory temporal requirement.

{61} Scenera further claims that it has sustained its burden in proving the REDA statutory affirmative defense that it would have terminated Morris on grounds independent of any retaliation for protected activity. *See* N.C. Gen. Stat. § 95-241(b) (2011). Specifically, Scenera claims that Morris

engaged in a "major act of insubordination" when refusing to execute further patent assignments. (R. Fry Dep. 184:18.) That defense depends on Scenera's contention that Morris was legally obligated to make such an assignment, and the Court has held that this disputed issue must be resolved at trial. It follows that the affirmative defense under REDA must likewise be resolved at trial.[4]

<u>Conclusion</u>

{62} Morris's Motion is DENIED.

{63} Defendants' Motion with respect to the following issues is GRANTED:

a) The question of whether Morris was hired to invent.

b) Morris's fraudulent inducement claim.

c) Morris's unjust enrichment claim.

{64} Defendants' Motion is otherwise DENIED:

IT IS SO ORDERED, this 4th day of January, 2012.

---

[4] Based on this determination, the Court need not resolve at this time Morris's separate argument that Scenera must first admit that it terminated Morris rather than accepting his resignation as a condition of raising the affirmative defense and whether Scenera's position that Morris resigned is an "inconsistent reason for termination" which bars the defense. *Compare Smith*, 568 F. Supp. 2d at 617 n. 18 *and Edwards v. PHS Phosphate Co.*, No. 4:10-CV-89-BO, 2011 WL 3916041, at *2–4 (E.D.N.C. Sept. 5, 2011).